***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Rideout with some modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as: *Page 2 
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to governance by the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed at all relevant times.
3. Defendant-employer was insured by Liberty Mutual Insurance Company at all times.
4. Plaintiff's average weekly wage is $707.83, yielding a compensation rate of $471.89.
5. The parties stipulated to the following documents as admissible evidence: Industrial Commission Forms 18, 28T (2), 62, and 33.
6. The issues before the Commission are to what benefits, if any, plaintiff is entitled to receive; whether plaintiff continues to be disabled as a result of his injury and, if not, since what date has plaintiff not been entitled to ongoing temporary total disability compensation; whether plaintiff's deep vein thrombosis and torn left knee meniscus are reasonably related to his injury and resulting treatment; whether plaintiff should be allowed to treat at North Carolina Baptist Hospital; and whether defendants retain the right to direct plaintiff's ongoing medical care, if any, through the authorized treating physicians previously provided to plaintiff.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 45 years old. He has a business degree and began working in numerous sales and retail jobs after college. *Page 3 
Plaintiff testified that he sold air quality products, vacuum cleaners, shoes and other items. His work history consisted of working on his feet 100% of the time. Plaintiff has never had a true "sit down" job in his past work experience.
2. Although plaintiff has a strong educational background, he has not recently worked directly in any of his major areas of education. Plaintiff graduated from college approximately 23 years ago and has not had any additional educational or vocational training.
3. Plaintiff became employed with defendant-employer at the Friendly Shopping Center in Greensboro, North Carolina in 1998. He had various schedules during the time he worked for defendant-employer. Plaintiff was able to maintain other jobs while working for defendant-employer and he changed his schedule to accommodate his other jobs. Plaintiff worked in the general appliance department; however, when the department was divided up, he decided to work with the Brand Central department. The Brand Central department included selling items such as washers and dryers as opposed to vacuum cleaners and floor care products, where plaintiff initially started.
4. During his time with defendant-employer, plaintiff earned approximately $700.00 per week. His earnings were based partly on commission and a $6.00 hourly rate if he did not generate enough sales to earn commission.
5. On November 7, 2003, plaintiff sustained an admittedly compensable injury by accident while employed by defendant-employer. Plaintiff was assisting a customer with a clothes dryer and attempted to demonstrate the two-inch hump in the back of the dryer. He tilted the dryer and looked to his left to answer a question from the customer. As plaintiff tilted the dryer, the backsplash on the dryer came apart and slashed his wrist. When plaintiff tried to catch the dryer, he sheared a bone in his left ankle and tore his rotator cuff in his left shoulder. *Page 4 
6. Initially, plaintiff sought medical treatment at North Carolina Baptist Hospital and Urgent Medical and Family Care. Plaintiff was consistent in his complaints of pain and problems and was sent to Greensboro Orthopedics where he saw Dr. Richard Ramos on February 10, 2004. Dr. Ramos referred plaintiff to Dr. Paul Bednarz for his ankle problems. Plaintiff had ankle surgery on April 6, 2004, which was performed by Dr. Bednarz. After the surgery, plaintiff remained non-weight bearing for a total of six weeks beginning on April 15, 2004.
7. After plaintiff's ankle surgery, he was referred to physical therapy by Dr. Bednarz, his authorized treating physician. On one occasion, plaintiff was working out with a weight machine when he felt a pop and clicking in his left knee. He reported this incident to the physical therapists. The physical therapy record for July 9, 2004 notes that plaintiff attempted the leg press, but that he continued to complain of a popping pain in his knee, despite limiting the range of motion and decreasing the weight. Plaintiff reported the problems in his knee to Dr. Bednarz who referred him for an MRI of the left knee on August 12, 2004. The MRI showed some abnormalities.
8. While continuing medical treatment for his ankle and knee, plaintiff also had problems with his shoulder as well. Plaintiff had an MRI of his left shoulder on September 13, 2004. A full thickness tear was identified in the supraspinatus tendon at its anterior insertion of the greater tuberosity. There was also evidence of supraspinatus tendinopathy. On September 28, 2004, Dr. Ramos referred plaintiff to Dr. Steven Norris for left shoulder surgery.
9. On October 19, 2004, plaintiff saw Dr. Norris for the first time. Dr. Norris performed left shoulder surgery on November 7, 2005, with a pre-operative diagnosis of left shoulder rotator cuff tear and acromioclavicular joint arthritis. The post-operative diagnosis was left shoulder superior labral tear anterior-posterior with unstable biceps anchor. Plaintiff also *Page 5 
had a partial thickness rotator cuff tear with chronic impingement syndrome, a subacromial spur formation, a prominent coracoacromial ligament, and acromioclavicular joint arthritis was found in his shoulder. Plaintiff was admitted overnight for observation after the surgery.
10. As of April 26, 2006, Dr. Norris felt plaintiff was at maximum medical improvement and gave plaintiff a 15% rating to his left shoulder. He also released plaintiff to permanent light-duty work restrictions. Plaintiff's restrictions have not changed significantly since April 26, 2006, and included unlimited lifting floor to chest and intermittent overhead lifting as necessary, keeping his elbow close to his side, avoidance of overhead lifting when possible, and no prolonged sustained overhead work.
11. Plaintiff had a second opinion with a doctor at N.C. Baptist Hospital and followed up with Dr. Bednarz on July 13, 2006. It was found that plaintiff had developed a deep vein thrombosis (DVT) in the left lower extremity. Dr. Bednarz noted that the DVT had actually been found on June 1, 2006. Plaintiff also reported swelling in his left ankle, leg and knee. The examination did reveal that the left lower extremity was extremely swollen. Dr. Bednarz did not think surgery was indicated and wanted to see plaintiff back after the DVT had resolved.
12. Dr. Tong Li-Masters began treating plaintiff on July 26, 2006, for his DVT. During her treatment of plaintiff, Dr. Li-Masters did not address plaintiff's ability to return to work, including whether plaintiff's DVT would preclude him from employment. Dr. Li-Masters testified that she could not determine whether plaintiff's left knee and ankle swelling was related to his November 7, 2003 injury due to the several years between the original injury and when she began treating him. Dr. Li-Masters could also not give an opinion whether plaintiff's DVT was related to his prior ankle surgery, stating, "I don't have a specific cause of the DVT." *Page 6 
13. Dr. Elizabeth R. Gamble is an attending physician and supervised Dr. Li-Masters. Dr. Gamble did not give an opinion as to the causation of plaintiff's DVT and swelling issues.
14. On October 25, 2006, Dr. Bednarz gave plaintiff a 10% rating to his ankle. On February 7, 2008, Dr. Bednarz discharged plaintiff from the clinic and referred him to Dr. Pamela Allen of Comp Rehab at N.C. Baptist Hospital. Dr. Bednarz testified that he believed the DVT plaintiff developed is independent of his ankle injury, as a DVT usually develops when a person is sedentary and plaintiff was highly mobile at that time. However, Dr. Bednarz did agree that a DVT can result from surgery, immobilization and major trauma. Dr. Bednarz stated that the November 7, 2003 incident was the significant contributing factor to the development of tendinitis and arthritis in plaintiff's ankle.
15. Dr. Bednarz further testified that the clicking and popping in plaintiff's knee was not present prior to the physical therapy incident. Plaintiff had ongoing problems with subluxation and swelling of the knee, and the 2007 MRI showed a meniscal tear. Both Dr. Bednarz and Dr. Poeling believed that the 2004 MRI could have missed a smaller meniscal tear that could have degenerated over time to the point of becoming a frank meniscus tear. Dr. Bednarz further stated his belief that physical therapy likely caused plaintiff's clicking and popping in his knee and that physical therapy could also have exacerbated a pre-existing lateral subluxation.
16. Dr. Gary Poehling testified that Dr. Allen was a fourth year resident when she began treating plaintiff, but that at the time of his deposition, she was the Chief Resident at Wake Forest University School of Medicine's Orthopedic Surgery program. Dr. Poehling and Dr. Allen did not relate plaintiff's current left knee problems to his November 7, 2003 injury. Regarding plaintiff's DVT, Dr. Poehling testified that a DVT is a possible complication from *Page 7 
surgery and that the DVT was probably related to plaintiff's prior surgeries resulting from his injury by accident. He stated, "Particularly, lower extremity surgeries are more at risk for DVT, so I think that's much easier for us to tie together, both from a historical point of view as well as percentage probability point of view." Dr. Poehling felt plaintiff could work in a sedentary capacity.
17. On August 23, 2007, plaintiff saw Dr. Norris for left knee pain. Dr. Norris restricted plaintiff to sedentary work for his knee and shoulder. At his deposition, Dr. Norris could not relate plaintiff's 2007 meniscus tear to physical therapy based upon the examination of plaintiff after the physical therapy incident and the MRI taken after the incident. However, Dr. Norris did testify that it is possible to tear the meniscus while exercising. Dr. Norris testified that plaintiff's mild and persistent left shoulder pain was caused by his November 7, 2003 compensable injury.
18. Plaintiff continued to seek treatment with N.C. Baptist Hospital for his left knee, ankle, and shoulder. Although defendants have argued that the treatment rendered by the physicians at N.C. Baptist Hospital had not been authorized, the competent evidence shows that defendants have indeed paid for some of plaintiff's medical treatment at N.C. Baptist Hospital.
19. Defendant-employer terminated plaintiff due to its company policy of terminating employees who have been out of work for a certain period of time. Plaintiff has not been released to full duty by any of his doctors, and defendant-employer has not offered plaintiff any job that would accommodate his restrictions.
20. Jack H. Dainty, vocational rehabilitation professional, testified that because plaintiff was written out of work for his left knee, he was not presently attempting to find *Page 8 
plaintiff a job. Mr. Dainty testified that based on plaintiff's educational and work history, plaintiff was employable once he is released to work in at least sedentary work.
21. The Full Commission gives greater weight to the opinions of Dr. Poehling concerning the causation of plaintiff's DVT and finds that plaintiff's DVT was directly related to, and was a natural and unavoidable consequence of, the compensable November 7, 2003 injury.
22. Plaintiff required ankle surgery that necessitated post-operative physical therapy. Therefore, the Full Commission gives greater weight to the opinions of Dr. Bednarz and finds that plaintiff's left knee condition was directly related to, and was a natural and unavoidable consequence of, the compensable November 7, 2003 injury.
23. The medical evidence of record shows that plaintiff was taken out of work by Dr. Allen on September 17, 2007 and that he has not been released to return to work. Additionally, the record shows that prior to being taken out of work, plaintiff attempted unsuccessfully to return to work with other employers.
24. The greater weight of the evidence establishes that the medical treatment plaintiff received for his left shoulder, left ankle, DVT, and left knee was reasonable and medically necessary, and was reasonably calculated to effect a cure, give relief, and lessen the period of disability from plaintiff's compensable November 7, 2003 injury.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW *Page 9 
1. On November 7, 2003, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Our courts have held that "when the primary injury is shown to have arisen out of and in the course of employment, every natural consequence that flows from the injury arises out of the employment, unless it is the result of an independent intervening cause attributable to claimant's own intentional conduct." English v. J.P. Stevens Co., 98 N.C. App. 466,391 S.E.2d 499 (1990); Roper v. J.P. Stevens Co., 65 N.C. App. 69,308 S.E.2d 485 (1983), disc. review denied, 310 N.C. 309, 312 S.E.2d 352
(1984). In this case, plaintiff's DVT and left knee condition are direct and natural consequences that flow from his compensable November 7, 2003 injury.
3. Defendants admitted the compensability of plaintiff's injury by accident by filing a Form 60. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with plaintiff. Sims v. Charmes/Arby's Roast Beef,142 N.C. App. 154, 542 S.E.2d 277 (2001).
4. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of *Page 10 
some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demeryv. Perdue Farms, Inc., supra.
5. In the present case, plaintiff met his burden by showing through medical evidence that he is physically, because of the work-related injury, incapable of work in any employment. Defendants have not shown that suitable jobs are available for plaintiff and that plaintiff is capable of obtaining a suitable job, taking into account plaintiff's physical, mental and vocational limitations. Demery v. Perdue Farms,Inc., supra.
6. Plaintiff is entitled to ongoing temporary total disability compensation at the rate of $471.89 per week until further Order of the Commission. N.C. Gen. Stat. § 97-29.
7. As a result of his compensable injury by accident, plaintiff sustained a 10% permanent partial disability to his left ankle and a 15% permanent partial disability to his left shoulder. Plaintiff is entitled to make an election between the more munificent remedies of continuing wage loss after maximum medical improvement or to receive payment for his disability ratings. N.C. Gen. Stat. § 97-31.
8. As a direct and natural result of his November 7, 2003 injury by accident, plaintiff required surgical intervention and physical therapy due to resulting injuries to his shoulder and left ankle. N.C. Gen. Stat. § 97-25. Plaintiff is entitled to have defendants pay for all related *Page 11 
medical expenses incurred or to be incurred necessary to provide relief, lessen disability or shorten the healing period, including but not limited to the past medical expenses at N.C. Baptist Hospital, treatment of the DVT, and his need for a left knee surgery. Id. Additionally, plaintiff has shown that there is a substantial risk of the necessity of future medical compensation. N.C. Gen. Stat. § 97-25, 97-25.1.
9. Plaintiff is entitled to reimbursement by defendants for his mileage for medical treatment and for out of pocket expenses, including but not limited to co-payments and prescription reimbursements. N.C. Gen. Stat. § 97-2 (19), 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee approved below, defendants shall pay plaintiff ongoing temporary total disability benefits at the rate of $471.89 per week until further Order of the Commission. Any compensation that has accrued shall be paid to plaintiff in a lump sum.
2. Defendants shall pay for all medical expenses, including co-payments, mileage, and other out of pocket expenses reasonably related to this claim, incurred or to be incurred by plaintiff as a result of his compensable injury when bills for same have been submitted, and for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief or lessen plaintiff's period of disability. The approved medical expenses include treatment at N.C. Baptist Hospital, treatment of the DVT and left knee. Defendants shall pay for any future necessary medical compensation that is reasonably related to this claim. *Page 12 
3. A reasonable attorney fee of 25% of the compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. Defendants shall pay all costs.
This 26th day of February 2009. S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 1